## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Eduardo Reyes-Trujillo, Gerardo
Santiago-Hernandez, Miguel Angel
Martinez-Barragan, Santos Bruno-
Cruz, Pablo Mateo-Velazquez, and
Andres Ponciano-Serna,

                        Plaintiffs,

v.

Four Star Greenhouse, Inc. and
Thomas Smith,

                        Defendants.

_____/

Case No. 20-11692

Judith E. Levy
United States District Judge

Mag. Judge R. Steven Whalen

## OPINION AND ORDER GRANTING IN PART AND
## DENYING IN PART DEFENDANTS' MOTION TO DISMISS [18]

Plaintiffs in this case are migrant workers from Mexico who came

to the United States in 2017 and 2018 on H-2A agricultural visas.

Plaintiffs assert that Defendants Thomas Smith and Four Star

Greenhouse, Inc. 1) did not compensate them for the work they

completed; and 2) when they complained about the money owed,

retaliated against them by having them jailed and then removed from

the United States. Plaintiffs allege violations of the Fair Labor Standards

Act (FLSA), the Migrant and Seasonal Agricultural Worker Protection Act (AWPA), the Trafficking Victims Protection Reauthorization Act (TVPRA), and Michigan's Workforce Opportunity Wage Act (WOWA). They also assert claims for breach of contract and unjust enrichment under Michigan law.

For the reasons set forth below, Defendants' motion is GRANTED with respect to the TVPRA and unjust enrichment claims and DENIED with respect to the FLSA, AWPA, and WOWA claims. Additionally, the Court ORDERS supplementary briefing on the question of whether the 2017 Four Star Job Order, or any other understanding between the parties, constituted an implied contract for purposes of Plaintiffs' breach of contract claim.

## I.   Background

### A. Defendants

Four Star is a domestic corporation with its principle place of business in Carleton, Michigan. (ECF No. 1, PageID.5, ¶ 22.) The company "sells young plants and finished crops throughout the United States to wholesale growers, retail growers, garden retailers and professional landscapers," employs over 100 workers annually, and has

over $18 million in annual sales. (*Id.* at ¶¶ 23, 25.) Defendant Smith founded Four Star in 1982 and is "the owner, President, Treasurer, Resident Agent, and a Director of Four Star." (*Id.* at PageID.6, ¶¶ 29–30.)

## B. Defendants' Recruiting Agent Vasquez Citrus & Hauling, Inc.

Defendants contracted with Vasquez Citrus & Hauling, Inc. (VCH), a farm labor contractor, to obtain noncitizen migrant workers on H-2A visas for its Michigan facilities.[1] (*See id.* at PageID.1, ¶ 2; PageID.8, ¶ 50.) VCH's principle place of business is in Lake Placid, Florida, (*id.* at PageID.8, ¶ 50), and it is owned by Juan Vasquez, (*see id.* at PageID.9, ¶ 56). In March 2016, VCH was fined "nearly $22,000 by the U.S. Department of Transportation" for a fatal bus crash that killed six H-2A

---

[1] Plaintiffs explain that, under the H-2A visa program, U.S. employers or their agents may bring temporary agricultural workers to the United States when there are not enough domestic workers available. (ECF No. 1, PageID.8, ¶ 46.) Foreign nationals cannot apply for an H-2A visa on their own, and, once issued, the H-2A visas are tied to specific employers and worksites. (*Id.* at ¶¶ 47–48.) Each visa is associated with a job order, "which sets the terms and conditions of [a visa holder's] employment, including H-2A program requirements such as reimbursement for inbound and outbound transportation costs to and from a worker's hometown, providing licensed migrant labor housing, the period of employment, and the hourly pay rate—at minimum, the state-specific Adverse Effect Wage Rate." (*Id.* at ¶ 49.)

workers it was transporting back to Mexico from Michigan. (*Id.* at ¶ 53.)
The company was also "disciplined and issued a civil monetary penalty
by Florida's Department of Business and Professional Regulation" on
August 31, 2017. (*Id.* at ¶ 54.) Subsequent to the events described in the
Complaint,

> the U.S. Department of Labor's Wage and Hour Division
> debarred VCH and its owner, Juan Vasquez, from the H-2A
> program for three years due to VCH's violations of the H-2A
> regulations in North Carolina, including failure to reimburse
> its H-2A workers for their inbound travel expenses and failure
> to provide adequate payroll or time records.

(*Id.* at ¶ 56.)

In 2017, Defendants selected VCH to serve as a labor contractor to
recruit H-2A workers from Mexico to work at Four Star's Monroe County,
Michigan facility. (*Id.* at PageID.1, ¶ 2; PageID.8, ¶ 50.) Smith signed the
contract with VCH on behalf of Four Star. (*Id.* at PageID.6, ¶ 31.) Under
the contract, VCH would "recruit and hire workers . . . to work at Four
Star's nursery and greenhouse operations in Michigan." (*Id.* at ¶ 32.)
Four Star agreed to "pay VCH an hourly rate based on workers' hours
and based on the rate of pay provided to those workers." (*Id.* at ¶ 35.)
Consistent with this agreement, "Four Star paid VCH based on a

4

calculation of the number of hours worked by workers recruited by VCH, including Plaintiffs." (*Id.* at ¶ 36.)

On December 11, 2017, VCH received authorization from the U.S. Department of Labor to bring 145 workers to three addresses in Michigan—all of which correspond to Four Star worksites—under H-2A Job Order No. 8349344 (the "Four Star Job Order" or "Job Order").[2] (*Id.* at PageID.10, ¶ 61.) The Job Order provided that "workers would work 'in a commercial nursery,' be paid $12.75 per hour, for an anticipated thirty-six (36) hours of work per week, [with an] anticipated period of employment of January 8, 2018 to July 30, 2018." (*Id.* at ¶ 62; *see also* ECF No. 37-1, PageID.409–413.)

## C. The 2017 Plaintiffs

---

[2] While the Four Star Job Order is referenced throughout the Complaint, Plaintiffs did not attach it as an exhibit to their initial filing. Defendants similarly did not attach a copy to their motion to dismiss. At the Court's request, Plaintiffs provided a copy of the Job Order through a "Notice of Supplemental Filing." (ECF Nos. 37, 37-1.)

"While documents 'integral' to the complaint may be relied upon, even if [they are] not attached or incorporated by reference, [i]t must also be clear that there exist no material disputed issues of fact regarding the relevance of the document." *Mediacom Se. LLC v. BellSouth Telecomms., Inc.*, 672 F.3d 396, 400 (6th Cir. 2012) (alterations in original) (citations and internal quotation marks omitted). Because the Four Star Job Order is integral to several of the claims alleged in the Complaint and there is no dispute over the validity of the document, the Court will rely on it where appropriate in evaluating this motion.

Plaintiffs Eduardo Reyes-Trujillo, Gerardo Santiago-Hernandez, Miguel Angel Martinez-Barragan, Santos Bruno-Cruz, and Pablo Mateo-Velazquez (collectively the "2017 Plaintiffs") allege that VCH brought them to the United States between May 2017 and September 2017 under H-2A visas.[3] (*See* ECF No. 1, PageID.3–4, ¶¶ 9–10.) Prior to traveling to the United States, the 2017 Plaintiffs obtained valid H-2A visas under various VCH job orders and "assumed personal loans with high interest rates to pay out of pocket for travel to Monterrey[, Mexico to apply for their visas], for their H-2A visa fees, and for related subsistence costs." (*Id.* at PageID.10–11, ¶¶ 67–69.) Despite the requirements of the H-2A visa program, the 2017 Plaintiffs were not reimbursed for their visa or travel costs within their first week in this country, yet they began accruing interest on their loans. (*See id.* at PageID.12, ¶ 76.)

---

[3] Plaintiffs later state that "[a]t various times from May 2017 until February 2018, VCH, *acting as an agent of the Defendants*, recruited and transported Plaintiffs from their homes in Mexico, with promises of well-paying work in the United States as H-2A workers." (ECF No. 1, PageID.10, ¶ 66 (emphasis added).) However, as Defendants point out, the contract between Four Star and VCH was not signed until November 21, 2017—well after the 2017 Plaintiffs had entered the U.S. (*See* ECF No. 18, PageID.137; *see also* ECF 18-1, PageID.173.) As such, VCH could not have been acting on behalf of Defendants when it recruited and transported the 2017 Plaintiffs to the United States.

6

Once in the United States, "the 2017 Plaintiffs were repeatedly moved between different states or worksites outside the terms of their contracts, and had little to no notice from [VCH] regarding where they would be taken next or how long they would be required to work." (*Id.* at PageID.11, ¶ 72.) VCH also routinely failed to pay the 2017 Plaintiffs or paid them with checks that had insufficient funds and could not be cashed. (*Id.* at ¶ 73.) "Prior to being brought to Michigan to work for Defendants, the 2017 Plaintiffs had not been paid for weeks of work and [VCH] said they would only be paid if they worked in Michigan." (*Id.* at ¶ 75.) VCH further "threatened to blacklist the 2017 Plaintiffs from the H-2A program if they did not work in Michigan." (*Id.* at PageID.12, ¶ 77.)

Plaintiff Martinez-Barragan began working for Defendants in December 2017. (*Id.* at PageID.4, ¶ 15.) Reyes-Trujillo, Santiago-Hernandez, Bruno-Cruz, and Mateo-Velazquez began working for Defendants in January 2018. (*Id.* at ¶¶ 13, 14, 16, 17.) "By the time [VCH] brought the 2017 Plaintiffs to Four Star, . . . [they] were so desperate for money for basic necessities, including food, with no means of returning home to Mexico, that they had little choice but to work at Four Star." (*Id.* at PageID.12, ¶ 79.) Despite reassurances from VCH that

their H-2A visas would be renewed, "by the time the 2017 Plaintiffs arrived in Michigan to work at Four Star, their visas were expired." (*Id.* at ¶ 78; *see also id.* at PageID.15, ¶ 103.)

### D. Plaintiff Ponciano-Serna

In February 2018, VCH brought Plaintiff Andres Ponciano-Serna and other H-2A workers directly from Mexico to Michigan to work for Defendants under the Four Star Job Order. (*See id.* at PageID.4, ¶¶ 11, 18; PageID.12, ¶ 80.) Like the 2017 Plaintiffs, he assumed personal loans with high interest rates in order to pay for his visa and travel costs. (*Id.* at PageID.11, ¶ 68; PageID.12, ¶ 81.) After Ponciano-Serna began working for Four Star, he was not reimbursed for his visa fee, travel costs, or subsistence expenses, "bringing his first week's wages below minimum wage."[4] (*Id.* at PageID.14–15, ¶ 102.)

### E. Plaintiffs' Work at Four Star

"By February 2018, all six named Plaintiffs were working at Four Star's Michigan worksite and living in migrant housing units located at [the] Chestnut Hills Apartments, in Monroe, Michigan." (*Id.* at

---

[4] Plaintiffs also allege that Ponciano-Serna was "not reimbursed his full outbound expenses to return home to Mexico." (ECF No. 1, PageID.15, ¶ 102.)

PageID.12, ¶ 82.) While working for Four Star, Plaintiffs "were instructed to follow Four Star's policies and procedures." (*Id.* at PageID.6, ¶ 34.) However, Plaintiffs were never given a copy of their contract or the written terms and conditions of their employment with Four Star. (*Id.* at PageID.13, ¶¶ 83–84.)

At Four Star's nursery, Plaintiffs' duties "consisted primarily of choosing and transporting plants from the greenhouse to the shipping department, where they ticketed plants with shipping code labels and packed them for shipping around the country." (*Id.* at ¶ 88.) In the course of this work, they were also expected to build boxes, sweep the area, and trim plants. (*Id.*) Plaintiffs were given "Four Star employee identification numbers" and were expected to track their time "through an electronic timekeeping system owned and operated by Four Star and developed by Defendant Smith." (*Id.* at PageID.14, ¶¶ 93–94; *see also* PageID.6–7, ¶¶ 37–38.) They also received "electronic key cards and the designated codes that corresponded to their different tasks" and were required "to scan their key cards each time they changed tasks." (*Id.* at PageID.14, ¶ 95.) Throughout, all of Plaintiffs' work "was conducted at Four Star owned and operated facilities." (*Id.* at PageID.13, ¶ 86.)

9

During this time, "Defendants' employees directly supervised every aspect of Plaintiffs' work, including: training Plaintiffs on their job duties and requirements; assigning and supervising tasks throughout the day; each day, reviewing and correcting any errors throughout the day; and generally maintaining a constant physical presence throughout every shift." (*Id.* at ¶ 90.) They also "provided Plaintiffs with all their tools and equipment, including gloves and tools to move and transport the plants." (*Id.* at ¶ 89.) Plaintiffs' work schedules, start and end times, and work assignments were all dictated by Defendants, (*id* at ¶ 91), and Defendants often required Plaintiffs to work more than sixty hours per week. (*Id.* at PageID.14, ¶ 92.) Defendants could also select particular workers from VCH, including Plaintiffs, who would remain employed at Four Star for an indefinite amount of time. (*Id.* at ¶ 96.)

While Plaintiffs were supposed to be compensated on a weekly basis at $12.75 per hour, they "were not paid on time, not paid consistently, and were not paid at all for hundreds of hours of work at Four Star." (*Id.* at ¶ 99.) They were repeatedly paid with checks that bounced and rarely received paystubs. (*Id.* at ¶¶ 100–01.)

## F. Retaliation Against 2017 Plaintiffs for Unpaid Wages

10

"While working at Four Star, the 2017 Plaintiffs repeatedly complained to Defendants and [VCH] that they had not been paid." (*Id.* at PageID.15, ¶ 108.) Reyes-Trujillo, Martinez-Barragan and Bruno-Cruz complained directly to VCH about their unpaid wages. (*Id.* at PageID.16, ¶ 114.) Santiago-Hernandez complained directly to two of his supervisors at Four Star about his unpaid wages. (*Id.* at ¶ 113.) Mateo-Velazquez was told by VCH "that they knew someone was complaining to Four Star" about their pay, (*id.* at ¶ 111), and that if VCH found out Mateo-Velazquez had complained to Four Star "he would be sent back to Mexico and blacklisted from the H-2A program." (*Id.* at ¶ 112.)[5]

On March 21, 2018, VCH's Francisco Vasquez told Reyes-Trujillo, Santiago-Hernandez, Martinez-Barragan, and Mateo-Velazquez to clean their apartments, pack away their personal items, and board a VCH bus—ostensibly so that Plaintiffs could go shopping at a Walmart during an inspection of the apartments. (*Id.* at PageID.16–17, ¶¶ 116–17.) When they arrived at the Walmart, "immigration agents were waiting and arrested [the four] Plaintiffs as they walked off the bus into the parking

---

[5] The Complaint does not specify who made these statements to Mateo-Velazquez.

lot." (*Id.* at PageID.17, ¶ 118.) Vasquez then called a number of other workers, including Bruno-Cruz, and summoned them to the Walmart under false pretenses, where they were also arrested by immigration officials. (*Id.* at ¶¶ 118–20.) Vasquez then "drove off in the bus, leaving the 2017 Plaintiffs and the other workers to be carted off by immigration agents, jailed, and placed in deportation proceedings." (*Id.* at ¶ 121.)

The 2017 Plaintiffs were then jailed at Calhoun County Correctional Center for over a month "until they were forced to depart from the United States." (*Id.* at ¶ 123.) They incurred significant expenses in returning to Mexico, which were never reimbursed. (*Id.* at PageID.18, ¶ 124.) Prior to their detention, the 2017 Plaintiffs had gone approximately four weeks without being paid. (*Id.* at PageID.16, ¶ 115.) Moreover, their personal belongings, including clothing and identity documents, were left in their apartments and not returned to them. (*Id.* at PageID.17, ¶ 122.) "The 2017 Plaintiffs have since been unable to get hired for jobs in the H-2A Program, either because they have been blacklisted, because they still have not recovered their travel documents and cannot afford new ones, or both." (*Id.* at PageID.18, ¶ 125.)

### G. Procedural Background

12

Plaintiffs filed this complaint on June 25, 2020. (ECF No.1.) The Complaint asserts eight causes of action:

1) failure to pay minimum wages under the FLSA by all Plaintiffs against both Defendants;[6]

2) violations of the FLSA's anti-retaliation provisions by the 2017 Plaintiffs against both Defendants;

3) violations of the AWPA by the 2017 Plaintiffs against both Defendants;

4) violations of the AWPA's anti-retaliation provisions by the 2017 Plaintiffs against both Defendants;

5) violations of the TVPRA by the 2017 Plaintiffs against both Defendants;

6) violations of Michigan's WOWA by all Plaintiffs against both Defendants;

7) breach of contract by all Plaintiffs against Four Star only; and

8) unjust enrichment by all Plaintiffs against both Defendants.

On September 16, 2020, Defendants filed a motion to dismiss the Complaint for failure to state a claim. (ECF No. 18.) That same day, Defendants also filed a third-party complaint against VCH. (ECF No. 17.) Plaintiffs responded to Defendants' motion on October 14, 2020, (ECF No. 27), and were joined by amicus curiae, the National Employment Law

---

[6] Plaintiffs bring this claim as a FLSA collective action under 29 U.S.C. § 216(b). (*See* ECF No. 1, PageID.18–19, ¶¶ 126–34.)

Project, (ECF No. 25-1.)[7] Defendants replied on October 29, 2020. (ECF No. 30.) The Court heard oral argument on the motion via video tele-conference on December 7, 2020.

## II.    Legal Standard

When deciding a motion to dismiss under Federal Rule of Procedure 12(b)(6), the Court must "construe the complaint in the light most favorable to the plaintiff and accept all allegations as true." *Keys v. Humana, Inc.,* 684 F.3d 605, 608 (6th Cir. 2012). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff's claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A plausible claim need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a

---

[7] The Court granted amicus leave to file in a text-only order on October 29, 2020.

formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555.

## III.   Analysis

### A. Failure to Pay Minimum Wages Under the FLSA

First, Plaintiffs allege that Defendants are liable to them and all other similarly situated current and former employees under the FLSA for failure to pay minimum wages. For the reasons below, this claim may proceed against both Four Star and Smith.

Under the FLSA, employers must pay their employees a minimum wage if the employees are "engaged in commerce or in the production of goods for commerce, or . . . employed in an enterprise engaged in commerce or in the production of goods for commerce." 29 U.S.C. § 206(a); *see also* 29 U.S.C. § 215(a)(2). "Congress passed the FLSA with broad remedial intent." *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 806 (6th Cir. 2015) (citing *Powell v. U.S. Cartridge Co.*, 339 U.S. 497, 509–11, 515 (1950)). In doing so, Congress intend the FLSA to "correct labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." *Id.* (internal quotations omitted) (quoting *Donovan v. Brandel,* 736 F.2d

1114, 1116 (6th Cir. 1984)). Accordingly, "[c]ourts interpreting the FLSA must consider Congress's remedial purpose."[8] *Id.*

"While the [FLSA] does define the terms 'employee,' 'employer,' and 'employ,' the definitions are exceedingly broad and generally unhelpful."[9] *Solis v. Laurelbrook Sanitarium & Sch., Inc.*, 642 F.3d 518, 522 (6th Cir. 2011) (citations omitted). "Whether an employment relationship exists under a given set of circumstances 'is not fixed by labels that parties may attach to their relationship nor by common law categories nor by classifications under other statutes.'" *Id.* (quoting *Powell*, 339 U.S. at 528). Instead, "it is the 'economic reality' of the relationship between parties that determines whether their relationship is one of employment

---

[8] However, the Supreme Court has recently cautioned that the FLSA does not "pursue[] its remedial purpose at all costs" and instead must be given a "fair" interpretation. *Encino Motorcars, LLC v. Navarro*, —— U.S. ——, 138 S.Ct. 1134, 1142 (2018) (rejecting the Ninth Circuit's narrow construction of the FLSA's exemptions); *see also Diaz v. Longcore*, 751 F. App'x 755, 758–59 (6th Cir. 2018) (holding that outside counsel was not the plaintiff's employer because he was not acting "on behalf of the actual employer . . . with respect to the employment relationship" and declining to interpret "employer" more broadly in the retaliation context than in the wage-and-hour context).

[9] "'[E]mployee' means any individual employed by an employer." 29 U.S.C. § 203(e)(1). "'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). "'Employ' includes to suffer or permit to work." 29 U.S.C. § 203(g).

or something else." *Id.* (citing *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 301 (1985)); *see also Acosta v. Off Duty Police Servs., Inc.*, 915 F.3d 1050, 1055 (6th Cir. 2019) ("To determine whether a worker fits within this expansive definition, we must look to see whether [the] worker, even when labeled as an 'independent contractor,' is, as a matter of 'economic reality,' an employee.") As the amicus explains, "the often-invoked concept of 'economic reality' is really a shorthand reminder to courts to look beyond technical distinctions, self-serving statements of subjective intent, contracts, or the labels putative employers give their workers, to discern the actual, objective, economic relationships among the parties." (ECF No. 25-1, PageID.260 (citing *Goldberg v. Whitaker House Co-op, Inc.*, 366 U.S. 28, 33 (1961)).)

### 1. Joint Employment by Four Star

"[M]ore than one 'employer' can be simultaneously responsible for FLSA obligations." *Fegley v. Higgins*, 19 F.3d 1126, 1131 (6th Cir. 1994) (citing *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 965 (6th Cir. 1991)). The terms "joint employer" and "joint employment" are not defined in the FLSA. While the Sixth Circuit has articulated factors for analyzing when a corporate officer is also an employer under the FLSA,

17

*see id.*, it has not explicitly identified a test for evaluating joint employment relationships in the context of FLSA claims. *See Sutton v. Cmty. Health Sys., Inc.*, No. 1:16-cv-01318-STA-EGB, 2017 WL 3611757, at *3 (W.D. Tenn. Aug. 22, 2017). District courts in this Circuit are divided with respect to the proper test (or tests) to apply to determine if a defendant is a joint employer. *See, e.g.*, *Ali v. Piron, LLC*, No. 17-CV-11012, 2018 WL 1185271, at *3–5 (E.D. Mich. Mar. 7, 2018) (discussing several approaches). Below, the Court discusses a number of potential frameworks for analyzing joint employment.

### a. The Frameworks Proposed by the Parties

The parties propose different approaches for determining whether Four Star was Plaintiffs' joint employer with VCH under the FLSA. In a footnote of their opening brief, Defendants point to the Ninth Circuit's four-factor test in *Bonnette v. Cal. Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983), but then fail to accurately apply its factors to the facts alleged in the Complaint.[10] (*See* ECF No. 18, PageID.163 n.1.)

---

[10] Plaintiffs frame the *Bonnette* question as one relying on Defendants "ha[ving] no economic dependence on Plaintiffs." (ECF No. 18, PageID.163 n.1). But as the Court discusses above, this is an inaccurate analysis of the *Bonnette* line of reasoning, which focuses on the *worker's* economic dependence on the putative employer. *See Torrez-Lopez*, 111 F.3d at 640-41.

18

Plaintiffs suggest that the Court should analyze joint employment under the FLSA and joint employment under the AWPA together by relying on the factors articulated in the AWPA regulations.[11] (ECF No. 27, PageID.294 (citing 29 C.F.R. § 500.20(h)(5)).) In their reply, Defendants do not return to *Bonnette* but instead assert that two related Sixth Circuit Title VII decisions—*Sanford v. Main St. Baptist Church Manor, Inc.*, 449 F. App'x 488, 491 (6th Cir. 2011), and *Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 993 (6th Cir. 1997)—govern questions of joint employment in this Circuit. (*See* ECF No. 30, PageID.366.)

### b. The Department of Labor's Regulations & *Bonnette*

Courts have frequently begun their analysis of joint employment with the Department of Labor's interpretive regulations of the FLSA in 29 C.F.R. § 791.2. From 1958 until March 16, 2020, these regulations explained that:

---

[11] Several Circuits have taken this approach and analyzed joint employment claims under the FLSA and the AWPA simultaneously. *See, e.g.*, *Torres-Lopez v. May*, 111 F.3d 633 (9th Cir. 1997); *Antenor v. D & S Farms*, 88 F.3d 925 (11th Cir. 1996). However, as the Eleventh Circuit has noted in a more recent case addressing only the FLSA, "[a]lthough the AWPA defines joint employment by reference to the definition provided in the FLSA, that does not mean that the reverse holds true—that joint employment under the FLSA is invariably defined by AWPA regulations." *Layton v. DHL Exp. (USA), Inc.*, 686 F.3d 1172, 1177 (11th Cir. 2012).

(a) A single individual may stand in the relation of an employee to two or more employers at the same time under the Fair Labor Standards Act of 1938 . . . . [I]f the facts establish that the employee is employed jointly by two or more employers, i.e., that employment by one employer is not completely disassociated from employment by the other employer(s), all of the employee's work for all of the joint employers during the workweek is considered as one employment for purposes of the Act. In this event, all joint employers are responsible, both individually and jointly, for compliance with all of the applicable provisions of the act . . . with respect to the entire employment for the particular workweek. . . .

(b) Where the employee performs work which simultaneously benefits two or more employers, or works for two or more employers at different times during the workweek, a joint employment relationship generally will be considered to exist in situations such as:

> (1) Where there is an arrangement between the employers to share the employee's services, as, for example, to interchange employees; or

> (2) Where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or

> (3) Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.

29 C.F.R. § 791.2 (effective though March 15, 2020) (footnotes omitted).

20

On January 16, 2020, the Department of Labor issued a Final Rule, 85 Fed. Reg. 2820, which significantly revised these regulations. Relevant to this case, the updated regulations now provide that:

> (a)(1) In the first joint employer scenario, the employee has an employer who suffers, permits, or otherwise employs the employee to work, but another person simultaneously benefits from that work. The other person is the employee's joint employer only if that person is acting directly or indirectly in the interest of the employer in relation to the employee. In this situation, the following four factors are relevant to the determination. Those four factors are whether the other person:
>
>> (i) Hires or fires the employee;
>>
>> (ii) Supervises and controls the employee's work schedule or conditions of employment to a substantial degree;
>>
>> (iii) Determines the employee's rate and method of payment; and
>>
>> (iv) Maintains the employee's employment records.
>
> . . . .
>
> (3)(i) The potential joint employer must actually exercise—directly or indirectly—one or more of these indicia of control to be jointly liable under the Act. No single factor is dispositive in determining joint employer status under the Act. Whether a person is a joint employer under the Act will depend on how all the facts in a particular case relate to these factors, and the appropriate weight to give each factor will vary

21

> depending on the circumstances of how that factor does
> or does not suggest control in the particular case.

29 C.F.R. § 791.2 (effective March 16, 2020) (citations omitted).[12] The revised regulations expressly adopt the Ninth Circuit's four factor *Bonnette* framework for analyzing joint employment. 85 Fed. Reg. 2820, 2820. The *Bonnette* approach has also been adopted by several other Circuits, including the First, Third, and Fifth. *See, e.g.*, *Baystate Alt. Staffing, Inc. v. Herman*, 163 F.3d 668, 675–76 (1st Cir. 1998); *In re Enter. Rent-A-Car Wage & Hour Emp. Pracs. Litig.*, 683 F.3d 462, 468–70 (3d Cir. 2012); *Gray v. Powers*, 673 F.3d 352, 354–57 (5th Cir. 2012). Several district courts in this Circuit have also applied *Bonnette*'s four factors in analyzing joint employment allegations. *See, e.g.*, *Smith v. Guidant Glob. Inc.*, No. 19-CV-12318, 2019 WL 6728359, at *3–5 (E.D. Mich. Dec. 11, 2019); *Dowd v. Directv, LLC,* No. 14-CV-14018, 2016 WL

---

[12] The regulations also provide that additional factors may be relevant but "only if they are indicia of whether the potential joint employer exercises significant control over the terms and conditions of the employee's work." 29 C.F.R. § 791.2(b) (effective March 16, 2020). However, the regulations explicitly reject any consideration of factors that look at an employee's economic dependence on the purported joint employer. *Id.* at § 791.2(c). If a joint employment relationship is established, joint employers may be held jointly and severally liable with the employer and other joint employers for violations of the Act. *Id.* at § 791.2(f).

28866, at *5–5 (E.D. Mich. Jan. 4, 2016). Other Circuits have criticized *Bonnette* for being too singularly focused on the issue of control—the cornerstone of common-law agency theory which the FLSA explicitly rejected in adopting its "to suffer or permit to work" definition of employment. *See Salinas v. Com. Interiors, Inc.*, 848 F.3d 125, 135–37 (4th Cir. 2017); *see also Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 66–69 (2d Cir. 2003) (explaining that while the *Bonnette* factors are sufficient to establish joint employment, they are neither exclusive or necessary).

After the adoption of the Final Rule, seventeen states and the District of Columbia sued the Department, alleging that the Department's changes to the joint employment regulations violated the APA. *See New York v. Scalia*, No. 1:20-CV-1689-GHW, 2020 WL 5370871, at *8 (S.D.N.Y. Sept. 8, 2020). On September 8, 2020, the Honorable Gregory H. Woods of the Southern District of New York found that the Department's new interpretation of the FLSA was arbitrary and capricious and vacated the revised § 791.2, with the exception of subparagraph (e). *Id.* at *34. The court held that, unlike *Bonnette* and its variants, the Final Rule requires joint employers to actually exercise

23

control, *id.* at *25–29, and expressly excludes consideration of economic dependence, *id.* at *29–31. The Department subsequently appealed that decision, and the case is currently pending before the Second Circuit. *See New York v. Scalia*, No. 20-3806 (2d Cir. Nov. 6, 2020).

### c. The Title VII Standard in *Swallows* and *Sanford*

Instead of *Bonnette* or the Final Rule, several district courts in this Circuit have looked to the Sixth Circuit's decisions in *Swallows* and *Sanford*, which analyzed joint employment claims under Title VII of the Civil Rights Act of 1964. *See, e.g., Martin v. Lincor Eatery, Inc.*, 423 F. Supp. 3d 432, 443–44 (E.D. Mich. 2019); *Rhea v. W. Tennessee Violent Crime & Drug Task Force*, No. 2:17-cv-02267-JPM-CGC, 2018 WL 7272062, *3–5 (W.D. Tenn. Dec. 12, 2018); *Sutton*, 2017 WL 3611757, at *3–4. In *Sanford*, which built on *Swallows*, the court explained that, in the context of Title VII, "[t]he joint-employer doctrine involves a business that maintains sufficient control over some or all of the formal employees of another business as to qualify as those employees' employer." 449 F. App'x at 491 (citing *Swallows*, 128 F.3d at 993 n.4). Factors relevant to this analysis include the alleged joint employer's "ability to hire, fire, and

discipline, affect compensation and benefits, and direct and supervise performance." *Id.* at 492.

Similar to the *Bonnette* factors and the revised regulations, *Sanford* and *Swallows*' exclusive focus on the purported joint employer's control runs counter to the FLSA's expansive definition of "employer." Moreover, as the Third Circuit has noted, the FLSA's departure from traditional concepts of agency law creates a "'textual asymmetry' between Title VII and the FLSA." *Faush v. Tuesday Morning, Inc.*, 808 F.3d 208, 214 (3d Cir. 2015); *compare* 29 U.S.C. § 203(d), (e)(1), (g) *with* 42 U.S.C. § 2000e (b), (f). For these reasons, *Sanford* and *Swallows* do not provide an adequate framework for analyzing joint employment claims under the FLSA.

### d. The Standard in *Int'l Longshorman*

Several other district courts in this Circuit have also considered the Sixth Circuit's decision in *Int'l Longshoremen's Ass'n, AFL-CIO, Local Union No. 1937 v. Norfolk S. Corp.*, 927 F.2d 900, 902 (6th Cir. 1991), when analyzing joint employment claims under the FLSA. *See, e.g.*, *Sutton*, 2017 WL 3611757, at *3–4; *Keeton v. Time Warner Cable*, No. 2:09-CV-1085, 2010 WL 2076813, at *2 (S.D. Ohio May 24, 2010). In the

25

context of a labor union dispute, the *Int'l Longshoremen* court explained that the key question was whether the employer "possesses sufficient control over the work of employees." 927 F.2d at 902. The court pointed to four factors for analyzing whether two companies are joint employers: 1) "the interrelation of operations between the companies," 2) "common management," 3) "centralized control of labor relations," and 4) "common ownership." *Id.* (quoting *Metro. Detroit Bricklayers Dist. Council v. J.E. Hoetger & Co.*, 672 F.2d 580, 584 (6th Cir. 1982)). But this exclusive focus on control again ignores the breadth of the FLSA's definition of "employer", rendering the *Int'l Longshoreman* framework inadequate for our purposes.

### e. The Existing Sixth Circuit Economic Reality Test

Of these approaches, the *Bonnette* factors are the most consistent with the FLSA's expansive definition of "employer" because they contemplate factors beyond the purported joint employer's level of control. However, "the FLSA does not distinguish between employers and joint employers. Any factor that is relevant to whether an entity is an employer is also relevant to whether the entity is a joint employer." *Scalia*, 2020 WL 5370871, at *29. Because the Sixth Circuit has

26

articulated a test for evaluating the economic reality of direct employment relationships under the FLSA, *Acosta*, 915 F.3d at 1055, the Court will apply this test to evaluate whether Four Star was Plaintiffs' joint employer. This consists of six factors:

> 1) the permanency of the relationship between the parties;
>
> 2) the degree of skill required for the rendering of the services;
>
> 3) the worker's investment in equipment or materials for the task;
>
> 4) the worker's opportunity for profit or loss, depending upon his skill;
>
> 5) the degree of the alleged employer's right to control the manner in which the work is performed . . . ; and
>
> 6) whether the service rendered is an integral part of the alleged employer's business.

*Id.* (alterations in original) (internal quotation marks omitted) (quoting *Keller*, 781 F.3d at 807). The Sixth Circuit has "also considered whether the business had 'authority to hire or fire the plaintiff,' and whether the defendant-company 'maintains the plaintiff's employment records.'" *Keller*, 781 F.3d at 807 (quoting *Ellington v. City of E. Cleveland*, 689 F.3d 549, 555 (6th Cir. 2012)). "None of these factors is determinative on its own, and each must be considered 'with an eye toward the ultimate

27

question—[the worker's] economic dependence on or independence from'
the alleged employer." *Acosta*, 915 F.3d at 1055 (alteration in original)
(quoting *Keller*, 781 F.3d at 807).

For the reasons below, the Court finds that each of these factors
weighs in favor of finding a joint employment relationship between
Plaintiffs and Four Star.

### i.   Permanency of the Relationship

The first factor considers the "length and regularity of the working
relationship between the parties." *Acosta*, 915 F.3d at 1057 (quoting
*Keller*, 781 F.3d at 807). However, "even short, exclusive relationships
between the worker and the company may be indicative of an employee-
employer relationship." *Keller*, 781 F.3d at 807. In the context of seasonal
agricultural harvesting, an exclusive, season-long relationship is
indicative of permanency. *Perez v. Howes*, 7 F. Supp. 3d 715, 723 (W.D.
Mich. 2014), *aff'd sub nom.*, *Perez v. D. Howes, LLC*, 790 F.3d 681 (6th
Cir. 2015); *see also Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1537 (7th
Cir. 1987). In concluding that this factor did not favor either party, the
district court in *Perez* explained that "[t]he harvest lasted only 45 days,
but most of the workers worked for the entire harvest;" "[t]he great

majority of the workers worked solely at the cucumber harvest;" and
"there [was] no indication that the workers had other full-time jobs
throughout the harvest." 7 F. Supp. 3d at 723–24.

The Four Star Job Order provided an "anticipated period of
employment of January 8, 2018 to July 30, 2018." (ECF No. 1, PageID.10,
¶ 62.) The Complaint does not address whether this period corresponded
to a particular harvest season. Ponciano-Serna worked at Four Star for
all but the first month of the Job Order, arriving in February 2018 and
working until the conclusion of the Order in July. (*Id.* at PageID.4, ¶ 18.)
While the 2017 Plaintiffs worked at Four Star for only three to four
months, they contend that "their employment was only cut short by
Defendants' unlawful retaliation." (ECF No. 27, PageID.297.) Though
Plaintiffs do not state explicitly that they worked exclusively at Four Star
during this period, the allegation that they regularly worked over sixty
hours per week supports a reasonable inference that they had little
opportunity to perform other work. (*See id.* at PageID.14, ¶ 92.) As such,
this factor weighs in favor of finding that Four Star was Plaintiffs' joint
employer.

### ii.   Degree of Skill Required

The next factor considers the worker's skillset in relation to the task being performed. *Acosta*, 915 F.3d at 1055 (citing *Brandel,* 736 F.2d at 1118). The focus of this inquiry is not the skills possessed by the workers, but "the degree of skill *required for the rendering of the services.*" *Id.* at 1056 (emphasis in original) (quoting *Keller*, 781 F.3d at 807). Other Circuits have considered whether a task requires initiative, judgment, foresight, or special skills. *Torres-Lopez*, 111 F.3d at 644.

Here, "Plaintiffs' duties at Four Star consisted primarily of choosing and transporting plants from the greenhouse to the shipping department, where they ticketed plants with shipping code labels and packed them for shipping around the country." (ECF No. 1, PageID.13, ¶ 88.) They were also responsible for "building boxes, sweeping, and trimming plants." (*Id.*) Defendants contend that "[w]ith respect to the degree of skill required, Plaintiffs make no allegations." (ECF No. 18, PageID.158.) However, the tasks described by Plaintiffs do not normally require specialized skills or advanced training, and Defendants concede in their reply that this factor favors Plaintiffs.[13] (ECF No. 30, PageID.369.) Thus,

---

[13] Defendants' contention that "[a]ll H2-A [sic] situations would seem similar," (ECF No. 30, PageID.369), is incorrect. *See, e.g.*, *Brandel*, 736 F.2d at 1118 (finding that the knowledge required for "rowing, blocking and picking for the smaller grades

this factor weighs heavily in favor of finding that Four Star was Plaintiffs' joint employer.

### iii.   Workers' Investment

The following factor considers the workers' investment in specialized equipment to complete their assigned tasks. *Acosta*, 915 F.3d at 1056. "This factor requires comparison of the worker's total investment to 'the company's total investment, including office rental space, advertising, software, phone systems, or insurance.'" *Id.* (quoting *Keller*, 781 F.3d at 810). "The capital investment factor is most significant if it reveals that the worker performs a specialized service that requires a tool or application which he has mastered." *Id.* (quoting *Brandel*, 736 F.2d at 1118–19).

Four Star operates a large successful agricultural business that "employs over 100 employees yearly and generates over $18 million in annual sales." (ECF No. 1, PageID.5, ¶ 25.) It uses a sophisticated electronic timekeeping system and labor tracking system that Smith

---

of pickles," and the workers' sole responsibility for monitoring the daily irrigation and insecticide needs of the fields, supported the judge's conclusion that the work required a heightened degree of skill).

developed. (*Id.* at PageID.6–7, ¶¶ 37–38.) Plaintiffs were issued "electronic key cards" by Four Star, which were used to track the tasks they completed. (*Id.* at PageID.14, ¶ 95.) "Defendants [also] provided Plaintiffs with all their tools and equipment, including gloves and tools to move and transport the plants." (*Id.* at PageID.13, ¶ 89.)

While Plaintiffs incurred significant personal expenses and debt in order to obtain their H-2A visas and travel to the United States, (*see* ECF No. 1, PageID.3, ¶ 9; PageID.11, ¶ 68), these expenses are dwarfed by the capital Defendants invested to create a sustain a multimillion-dollar business with multiple locations. Defendants' citation to *Perez* underscores this point. (*See* ECF No. 18, PageID.159.) In finding that the farm workers were employees of a cucumber farmer, the district court explained:

> The record is clear that [d]efendant's investment dwarfed that of the workers. The workers were not required to provide any of their own equipment, although many supplied their own dishwashing gloves, and some brought their own wheelbarrows. In contrast, [d]efendant supplied hoes, collection boxes, and the forklifts used to lift the boxes.

*Perez*, 7 F. Supp. 3d at 725 (footnote omitted). Therefore, this factor strongly supports a finding that Four Star was Plaintiffs' joint employer.

### iv.   Opportunity for Profit or Loss

The next factor considers whether the workers' opportunity for profit or loss depended on their managerial or technical skills. *Acosta*, 915 F.3d at 1059. As the Sixth Circuit has explained, "[c]ourts evaluate this factor by asking if workers 'could exercise or hone their managerial skill to increase their pay.'" *Id.* (quoting *Schultz v. Cap. Int'l Sec., Inc.*, 466 F.3d 298, 307 (4th Cir. 2006)). If a worker can compete for more work by increasing their efficiency, this factor may weigh against finding an employment relationship. *Id.*

Based on the Four Star Job Order, Plaintiffs were to be paid at a fixed hourly rate, $12.75 per hour, on a weekly basis. (ECF No. 1, PageID.10, ¶ 62; PageID.14, ¶ 99.) This wage was only subject to adjustment based on a change to the Adverse Effect Wage Rate.[14] (*Id.* at

---

[14] The Adverse Effect Wage Rate (AEWR) is "[t]he annual weighted average hourly wage for field and livestock workers (combined) in the States or regions as published annually by the U.S. Department of Agriculture (USDA) based on its quarterly wage survey." 20 C.F.R. § 655.103(b). "[A]n employer must offer, advertise in its recruitment, and pay a wage that is the highest of the AEWR, the prevailing hourly wage or piece rate, the agreed-upon collective bargaining wage, or the Federal or State minimum wage." *Id.* at § 655.120(a) "If the prevailing hourly wage rate or piece rate is adjusted during a work contract, and is higher than the highest of the AEWR, the prevailing wage, the agreed-upon collective bargaining wage, or the Federal or State minimum wage, in effect at the time the work is performed, the employer must pay that higher prevailing wage or piece rate, upon notice to the employer by the Department." *Id.* at § 655.120(b)

33

PageID.10, ¶ 60; ECF No. 18-1, PageID.173.) Nothing in the Complaint or the Four Star and VCH contract suggests Plaintiffs were eligible for any other form of compensation based on increased efficiency or skill. Therefore, this factor further supports a finding that Four Star was Plaintiffs' joint employer.

### v.   Right to Control

This factor considers the degree of control the putative employer may exercise over the workers. *Acosta*, 915 F.3d at 1060. "To guide this evaluation, [the court] ask[s] whether the company 'retains the right to dictate the manner' of the worker's performance." *Id*. (quoting *Brandel*, 736 F.2d at 1119). However, "'[t]he absence of need to control should not be confused with the absence of right to control,' and the actual exercise of control 'requires only such supervision as the nature of the work requires.'" *Id*. at 1061 (alteration in original) (quoting *Peno Trucking, Inc. v. Comm'r of Internal Revenue*, 296 F. App'x 449, 456 (6th Cir. 2008)).

While working at Four Star, Plaintiffs were directly supervised by Four Star employees. (ECF No. 1, PageID.13, ¶ 90.) These employees trained Plaintiff on their job duties, assigned and supervised their work throughout the day, reviewed and corrected errors made by Plaintiffs,

and maintained a "constant physical presence throughout every shift." (*Id.*) Four Star provided all of the tools and equipment Plaintiffs used to complete their work. (*Id.* at ¶ 89.) Plaintiffs were required to track their time through Four Star's electronic timekeeping system and track their tasks using electronic key cards provided by Four Star. (*Id.* at PageID.14, ¶¶ 94–95.) Four Star also "set the Plaintiffs' daily work schedules, controlled Plaintiffs' daily starting and stopping times, and work assignments," (*id.* at PageID.13, ¶ 91), frequently requiring Plaintiffs to work over sixty hours per week. (*Id.* at PageID.14, ¶ 92.) All of Plaintiffs work for Four Star "was conducted at Four Star owned and operated facilities." (*Id.* at PageID.13, ¶ 86.)

Defendants' only response to these assertions is to claim that they lack factual details or specifics and to demand more detail regarding what equipment was provided, how Plaintiffs were supervised, and how Four Star controlled start and stop times. (*See* ECF No. 18, PageID.144–145.) But exact "examples, dates, or employer purposes" are not required at this procedural stage. (*Id.* at PageID.145.) Moreover, Plaintiffs' complaint is exceptionally detailed, as set forth above. Therefore, this

factor strongly supports a finding that Four Star was Plaintiffs' joint employer.

### vi. Integral Part of the Alleged Employer's Business

This factor considers how integral the workers were to the alleged employer's business. *Acosta*, 915 F.3d at 1055. "The more integral the worker's services are to the business, then the more likely it is that the parties have an employer-employee relationship." *Id.* (quoting *Keller*, 781 F.3d at 815). In *Perez*, the district court found that the "[d]efendant derived 84 percent of his income from pickle farming" and, accordingly, the "[d]efendant could not reasonably dispute that the workers' services during the cucumber harvest were an integral part of his business, nor does he make such an attempt." 7 F. Supp. 3d at 726.

Plaintiffs explain that "Four Star sells young plants and finished crops throughout the United States to wholesale growers, retail growers, garden retailers and professional landscapers," "employs over 100 employees" annually, and "generates over $18 million in annual sales." (ECF No. 1, PageID.5, ¶¶ 23–24.) While working at Four Star, Plaintiffs worked primarily in the shipping department, fulfilling orders from Four Star's customers around the country. (*Id.* at PageID.15, ¶¶ 87–88.)

36

Defendants respond that "Plaintiffs worked for a short number of months performing low-skilled work. They did not make or break the season." (ECF No. 30, PageID.369.) While the Complaint does not specify what portion of Four Star's business the shipping department supported, with 145 workers authorized under the Four Star Job Order, (*see* ECF No. 1, PageID.10, ¶ 61), it is certainly plausible on the face of the Complaint that they were integral to Four Star's successful operations during the seven months covered under the Order. Thus, this factor also supports a finding that Four Star was Plaintiffs' joint employer.

### vii.   Balancing the Factors, Plaintiffs Were Employees

The discussion above makes clear that Four Star was Plaintiffs' joint employer under the FLSA. "None of these factors is determinative on its own, and each must be considered 'with an eye toward the ultimate question—[the worker's] economic dependence on or independence from' the alleged employer." *Acosta*, 915 F.3d at 1055 (alteration in original) (quoting *Keller*, 781 F.3d at 807). Here, Plaintiffs' work for Four Star did not require a high degree of skill, their capital investment was dwarfed by Four Star's, and they were paid at a fixed rate without any ability to increase their compensation through increased skill or efficiency.

37

Moreover, Four Star retained and regularly exercised control over almost every aspect of Plaintiffs' work. While the permanency of the relationship does not weigh strongly in either direction, Plaintiffs' work fulfilling orders for Four Star's customers was likely integral to Four Star's successful operations. As such, Plaintiffs have sufficiently established that Four Star was their joint employer under the FLSA.[15]

### 2. Smith's Individual Liability

Individual corporate officers, like Smith, may also be held liable for violations under the FLSA by a corporation. The Act itself defines "[e]mployer" as "any person acting directly or indirectly in the interest of

---

[15] Even if the Court were to adopt one of the other frameworks set forth above, the outcome would be the same. Under *Bonnette*, extensive control of the employee's work is *sufficient* to establish a joint employment relationship even if it is not *necessary*. *Cf. Zheng*, 355 F.3d at 71. Similarly, in applying *Swallows* and *Sanford*, "sufficient control over some or all of the formal employees or another business" will support a finding of a joint employment relationship. *Sanford*, 449 F. App'x at 491. Finally, under *Int'l Longshoremen,* the key question is whether the purported joint employer "possesses sufficient control over the work of employees." 927 F.2d at 902.

The Complaint alleges that Four Star set Plaintiffs' schedules, assigned and supervised their daily work, provided all of the tools necessary to perform the assigned work, gave them employee identification numbers, and required them to follow Four Star's timekeeping policies. As set forth above, these allegations establish that Four Star maintained and exercised extensive control over the workers it obtained through its relationship with VCH, including Plaintiffs. As such, Plaintiffs could also establish that Four Star was their joint employer under *Bonnette*, *Swallows*, and *Int'l Longshoremen*.

38

an employer in relation to an employee." 29 U.S.C. § 203(d). In *Dole*, the

Sixth Circuit explained that:

> "The overwhelming weight of authority is that a corporate
> officer with operational control of a corporation's covered
> enterprise is an employer along with the corporation, jointly
> and severally liable under the FLSA for unpaid wages."
> *Donovan v. Agnew*, 712 F.2d 1509, 1511 (1st Cir. 1983). In
> *Agnew*, the court determined that "corporate officers with a
> *significant ownership interest* who had *operational control of*
> *significant aspects of the corporation's day to day functions*,
> including compensation of employees, and who personally
> made decisions to continue operations despite financial
> adversity during the period of non-payment" were employers
> under the FLSA. *Id*. at 1514. "No one factor is dispositive;
> rather, it is incumbent upon the courts to transcend
> traditional concepts of the employer-employee relationship
> and assess the economic realities presented by the facts of
> each case." [*Donovan v. Sabine Irrigation Co.*, 695 F.2d 190,
> 195 (5th Cir. 1983)].

*Dole*, 942 F.2d at 965 (emphasis added); *see also Fegley*, 19 F.3d at 1131

(applying *Dole* and holding CEO jointly liable for all damages on

remand). In *Cole*, the Court of Appeals applied *Dole* and *Fegely* and

affirmed the district court's determination that the defendant

president—who owned 50% of company, was engaged in running the

business, and had authority to sign checks on corporate accounts—was

an employer under the FLSA. *U.S. Dep't of Labor v. Cole Enters., Inc.*, 62 F.3d 775, 778–79 (6th Cir. 1995).

The facts of this case are similar to those in *Dole¸ Fegley*, and *Cole*. Smith founded Four Star in 1982 and is "the owner, President, Treasurer, Resident Agent, and a Director of Four Star." (ECF No. 1, PageID.6, ¶¶ 29–30.) He exercised this authority in executing the contract with VCH on behalf of Four Star. (*Id.* at PageID.6, ¶ 31; ECF No. 18-1, PageID.177.) Smith also "developed Four Star's electronic labor tracking software which tracks labor costs along with plant type," (ECF No. 1, PageID.7, ¶ 38), which was used to "track[] the type of tasks and plants [Plaintiffs] were handling throughout the[ir] workday." (*Id.* at PageID.6, ¶ 37; *see also* PageID.14, ¶¶ 94–95.) At this stage of the litigation, these allegations are sufficient to establish that Smith possessed sufficient ownership and control over Four Star to qualify as Plaintiffs' "employer" under the FLSA.

### 3. Willfulness and the Statute of Limitations

Violations of the FLSA are ordinarily subject to a two-year statute of limitations. 29 U.S.C. § 255(a). "However, where a violation is 'willful' a three-year statute of limitations applies." *Dole*, 942 F.2d at 966 (citing

*McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 135 (1988)). Because the FLSA violations alleged in the Complaint occurred more than two years (but less than three years) before Plaintiffs commenced this action, their claims may only proceed if the violations were willful within the meaning of the FLSA.

A violation of the FLSA is willful if an employer "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Richland Shoe Co.*, 486 U.S. at 133. "[A]lthough conditions of a person's mind may be alleged generally, the plaintiff still must plead facts about the defendant's mental state, which, accepted as true, make the state-of-mind allegation plausible on its face." *Katoula v. Detroit Entm't, LLC*, 557 F. App'x 496, 498 (6th Cir. 2014) (internal quotations omitted) (quoting *Republic Bank & Trust Co. v. Bear Stearns & Co.*, 683 F.3d 239, 247 (6th Cir. 2012)); *see also Doucette v. DIRECTV, Inc.*, No. 2:14-CV-02800-STA, 2015 WL 2373271, at *5 (W.D. Tenn. May 18, 2015) (applying *Katoula* to the plaintiffs' FLSA claims). "Courts in the Sixth Circuit have held that, so long as an FLSA defendant's alleged scheme is described in some detail, general assertions of willfulness create a plausible claim." *Dowd¸* 2016 WL 28866, at *5–6

41

(collecting cases) (explaining that the plaintiffs' allegations regarding the defendants' policies and practices, combined with their general claim that the purpose of these policies was to avoid the FLSA, stated a plausible claim of willfulness).

The Department of Labor's regulations explain that "an employer's conduct shall be deemed to be in reckless disregard of the requirements of the Act, among other situations, if the employer should have inquired further into whether its conduct was in compliance with the Act, and failed to make adequate further inquiry." 29 C.F.R. § 578.3(c)(3). Consistent with this view, courts in this Circuit have held that an employer acts with reckless disregard of the FLSA's requirements when it hears, but does not act upon, complaints that employees were not being paid the compensation owed to them. *See Nance v. Crockett Cnty., Tenn.*, 150 F. Supp. 3d 881, 893 (W.D. Tenn. 2015) (citing *Bacon v. Eaton Aeroquip, LLC*, No. 11–cv–14103, 2014 WL 5090825, at *9–10 (E.D. Mich. Oct. 9, 2014)).[16]

---

[16] In their reply, Defendants contend that these decisions "are summary judgment cases and irrelevant at this stage." (ECF No. 30, PageID. 357 n.6.) However, Defendants do not address how the alleged conduct in these cases fails to show reckless disregard for the FLSA's obligations.

As detailed in the Complaint, VCH repeatedly failed to pay Plaintiffs or paid them with checks that could not be cashed due to insufficient funds. (*See* ECF No. 1, PageID.11, ¶¶ 73, 75; PageID.14, ¶¶ 99–100.) Plaintiffs also complained about their unpaid wages to both VCH *and* their supervisors at Four Star. (*Id.* at PageID.16, ¶¶ 113–14.) Four Star's failure to address this issue once raised by Plaintiffs constitutes, at a minimum, reckless disregard for the FLSA's requirements. *Nance*, 150 F. Supp. at 893. Moreover, Four Star's attempt to delegate its FLSA obligations to VCH in their 2017 contract, (ECF No. 18-1, PageID.173), supports an inference that Four Star knew that the workers VCH provided were subject to the Act's protections.

Also, because Plaintiffs have sufficiently alleged that Defendants were their joint employers under the FLSA, Four Star and Smith are "jointly and severally liable with [VCH] . . . for compliance with all of the applicable provisions of the Act." 29 C.F.R. § 791.2 (effective March 16, 2020);[17] *see also Reed v. Friendly's Ice Cream, LLC*, No. 15-CV-0298, 2016

---

[17] This outcome is no different even if the prior regulations remain operative. 29 C.F.R. § 791.2 (effective though March 15, 2020) ("[A]ll joint employers are responsible, both individually and jointly, for compliance with all of the applicable provisions of the [FLSA].").

43

WL 2736049, at *6 (M.D. Pa. May 11, 2016). Defendants' are therefore liable for VCH's willful violations of the FLSA.

Accordingly, Plaintiffs claims are not barred by the two-year statute of limitations.

## B. Retaliation in Violation of the FLSA

The 2017 Plaintiffs next allege that Defendants are liable for retaliation in violation of the FLSA. For the following reasons, the Court finds that Plaintiffs plausibly state a claim for retaliation.

"The anti-retaliation provision of FLSA provides that an employer is prohibited from 'discharg[ing] or in any other manner discriminat[ing] against [an] employee because such employee has filed [a] complaint or instituted . . . any proceeding under [the FLSA].'" *Adair v. Charter Cnty. of Wayne*, 452 F.3d 482, 489 (6th Cir. 2006) (alterations in original) (quoting 29 U.S.C. § 215(a)(3)). While the *McDonnell Douglas* burden-shifting framework applies to retaliation claims under the FLSA, *id.*, at the pleading stage, a plaintiff need only allege sufficient facts to support a reasonable inference of unlawful retaliation. *See Keys v. Humana, Inc.*, 684 F.3d 605, 609–10 (6th Cir. 2012).

Employees need not file formal charges to trigger the FLSA's anti-retaliation protections. *See E.E.O.C. v. Romeo Cmty. Sch.*, 976 F.2d 985, 989–90 (6th Cir. 1992). Instead, the Act's anti-retaliation provisions may be triggered when an employee merely complains directly to an employer. *Id.* These complaints may be written or oral. *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14 (2011). Regardless of how the employee chooses to complain, the complaint must be "sufficiently clear and detailed for a reasonable employer to understand it . . . as an assertion of rights protected by the statute and a call for their protection." *Id.*

Here, the 2017 Plaintiffs complained orally about unpaid wages to both VCH and supervisors at Four Star. (*Id.* at PageID.16, ¶¶ 113–14.) Soon after, Mateo-Velazquez was told that VCH "knew someone was complaining to Four Star" about their pay, (*id.* at ¶ 111), and that if VCH found out that he had complained to Four Star, "he would be sent back to Mexico and blacklisted from the H-2A program." (*Id.* at ¶ 112.) Approximately one week later, VCH's Francisco Vasquez followed through on that threat and orchestrated the 2017 Plaintiffs arrest by immigration authorities. (*Id.* at PageID.16–17, ¶¶ 116–21.) The 2017

45

Plaintiffs were jailed and then "forced to depart from the United States" after being placed in removal proceedings. (*See id.* at PageID.17, ¶ 123.)

Defendants assert that Plaintiffs "fail to plausibly allege that Defendants could or did retaliate against them because their retaliation claims are based entirely on [VCH]'s actions, rather than Defendants' actions." (ECF No. 18, PageID.136.) However, because Plaintiffs have sufficiently alleged that Defendants were their joint employers under the FLSA, they are "jointly and severally liable with [VCH] . . . for compliance with all of the applicable provisions of the Act." 29 C.F.R. § 791.2 (effective March 16, 2020). That the alleged retaliation was carried out by VCH and not Defendants is therefore no defense.

Accordingly, the 2017 Plaintiffs have plausibly alleged a FLSA retaliation claim against Defendants.

## C. Violations of the AWPA

The 2017 Plaintiffs next allege that Defendants also violated various provisions of the AWPA,[18] including failing to provide them with

---

[18] The 2017 Plaintiffs invoke the AWPA's protections for migrant agricultural workers. 29 U.S.C. §§ 1821–1822. Under the AWPA, a "migrant agricultural worker" is "an individual who is employed in agricultural employment of a seasonal or other temporary nature, and who is required to be absent overnight from his permanent place of residence." 29 U.S.C. § 1802(8)(A). However, the statute explicitly excludes

46

paystubs, failing to pay them their wages when due, "violat[ing] the terms of the working arrangement without justification," and knowingly providing them false or misleading information.[19] (ECF No. 1, PageID.23–24, ¶¶ 161–66.) Defendants object that they were not "Plaintiffs' employer, recruiter, or [otherwise] responsible for causing their visas to not be extended or providing allegedly inaccurate visa information." (ECF No. 18, PageID.126.) For the following reasons, the Court finds that Plaintiffs plausibly state a claim.

As the amicus explains, "Congress adopted [the] AWPA out of frustration with prior efforts to regulate the abuses of agricultural labor contractors." (ECF No. 25-1, PageID.261 (citing H.R. No. 885, 97th Cong., 2d Sess. at 2–3(1982)).) To this end, the AWPA explicitly imports the

---

"any temporary nonimmigrant alien who is authorized to work in agricultural employment" on a H-2A visa from the definition of "migrant agricultural worker." *Id.* at § 1802(8)(B). Here, the 2017 Plaintiffs allege that when they arrived in Michigan and began working for Four Star their H-2A visas were already expired. (*See* ECF No. 1, PageID.12, ¶ 78.)

[19] The Complaint also alleges that Defendants violated 29 U.S.C. § 1821(a) by failing to provide the 2017 Plaintiffs with required written disclosures of the terms and conditions of employment. (ECF No. 1, PageID.23, ¶ 160.) Defendants assert in their opening brief that only "recruiters" are subject to claims under § 1821(a). (ECF No. 18, PageID.164–165.) Plaintiffs withdraw this particular claim in their response to Defendants' motion. (ECF No. 27, PageID.318 n.13.)

47

expansive definition of "employ" from the FLSA. 29 U.S.C. § 1802(5); *see also* 29 C.F.R. § 500.20(h)(1). In assessing whether a joint employment relationship exists under the AWPA, "the ultimate question to be determined is the economic reality—whether the worker is so economically dependent upon the agricultural employer/association as to be considered its employee." 29 C.F.R. § 500.20(h)(5)(iii); *see also Torres-Lopez*, 111 F.3d at 641 ("The issue is not whether a farmworker is more dependent upon the farm labor contractor or the grower. Rather, the inquiry must focus on the economic reality of the particular relationship between the farmworker and the alleged joint employer.") Moreover, the Department of Labor's regulations provide that "[j]oint employment under the Fair Labor Standards Act is joint employment under the [AWPA]." *Id.* at § 500.20(h)(5)(i). The Department also provides a non-exhaustive list of factors for evaluating joint employment relationships:

> (A) Whether the agricultural employer[] has the power, either alone or through control of the farm labor contractor to direct, control, or supervise the worker(s) or the work performed . . . ;
>
> (B) Whether the agricultural employer[] has the power, either alone or in addition to another employer, directly or indirectly, to hire or fire, modify the employment conditions, or determine the pay rates or the methods of wage payment for the worker(s);

48

(C) The degree of permanency and duration of the relationship of the parties, in the context of the agricultural activity at issue;

(D) The extent to which the services rendered by the worker(s) are repetitive, rote tasks requiring skills which are acquired with relatively little training;

(E) Whether the activities performed by the worker(s) are an integral part of the overall business operation of the agricultural employer/association;

(F) Whether the work is performed on the agricultural employer[]'s premises, rather than on premises owned or controlled by another business entity; and

(G) Whether the agricultural employer[] undertakes responsibilities in relation to the worker(s) which are commonly performed by employers, such as preparing and/or making payroll records, preparing and/or issuing pay checks, paying FICA taxes, providing workers' compensation insurance, providing field sanitation facilities, housing or transportation, or providing tools and equipment or materials required for the job (taking into account the amount of the investment).

*Id.* at § 500.20(h)(5)(iv).[20] Courts have also considered "non-regulatory factors" when evaluating the economic reality of a purported employment relationship. *Torres-Lopez*, 111 F.3d at 640–41.

---

[20] "The term 'agricultural employer' means any person who owns or operates a farm, ranch, processing establishment, cannery, gin, packing shed or nursery, or who produces or conditions seed, and who either recruits, solicits, hires, employs, furnishes, or transports any migrant or seasonal agricultural worker." 29 U.S.C.

Because Four Star and Smith were Plaintiffs' joint employers under the FLSA, this analysis is not difficult. Four Star's employees supervised and exercised extensive control over the 2017 Plaintiffs' work while they were at Four Star. (*See* ECF No. 1, PageID.13–14, ¶¶ 85–95.) Four Star also "had the authority, and exercised the authority, to direct their recruiting agent VCH to select particular workers, including Plaintiffs, to remain employed at Four Star." (*Id.* at PageID.14, ¶ 96.) The 2017 Plaintiffs performed repetitive tasks that required limited skill or training, (*id.* at PageID.13, ¶ 88), Four Star provided all of the necessary tools and equipment, (*id.* at ¶ 89), and all of the 2017 Plaintiffs' work was done at Four Star's facilities. (*Id.* at ¶ 86.) Taken together, these factors make clear that the 2017 Plaintiffs were "so economically dependent upon [Four Star] as to be considered its employee[s]." 29 C.F.R. § 500.20(h)(5)(iii).

---

§ 1802(2); 29 C.F.R. § 500.20(d). "The term 'farm labor contractor' means any person, other than an agricultural employer, an agricultural association, or an employee of an agricultural employer or agricultural association, who, for any money or other valuable consideration paid or promised to be paid, performs any farm labor contracting activity." 29 U.S.C. § 1802(7); 29 C.F.R. § 500.20(j).

Plaintiffs have sufficiently alleged that Four Star was its joint employer under the AWPA and may therefore be held liable for VCH's violations of the Act. Because Smith exercised sufficient control over Four Star to be individually liable as an employer under the FLSA, he is also individually liable under the AWPA. *Cf. Dole*, 942 F.2d at 965; § 500.20(h)(1) ("The term employer . . . includes any person acting directly or indirectly in the interest of an employer in relation to an employee.").

## D. Retaliation in Violation of the AWPA

The 2017 Plaintiffs also allege that Defendants are liable for VCH's retaliation against them under the AWPA's anti-retaliation provisions. The Court agrees.

The relevant portion of the statute provides that individuals may not "threaten, restrain, coerce, blacklist, discharge, or in any manner discriminate against any migrant []agricultural worker because such worker has, with just cause, filed any complaint . . . under or related to this chapter." 29 U.S.C. § 1855(a). The same conduct that plausibly supports the 2017 Plaintiffs' FLSA retaliation claim is equally applicable here. (*See* ECF No. 1, PageID.16–17, ¶¶ 111–23.) Moreover, Plaintiffs'

allegations that VCH repeatedly threatened to blacklist, and in fact did blacklist some Plaintiffs from the H-2A program, further supports this claim. (*See id.* at PageID.12, ¶ 77; PageID.16, ¶ 112; PageID.18, ¶ 125.) As with the 2017 Plaintiffs' other AWPA claims, both Four Star and Smith may be held liable for VCH's conduct as joint employers.

Accordingly, Plaintiffs plausibly allege a claim for retaliation under the AWPA.

### E. Violations of the TVPRA

The 2017 Plaintiffs next assert two claims under the TVPRA against both Defendants. For the following reasons, the Court finds that Plaintiffs fail to state a claim.

The TVPRA makes it a criminal offense to obtain labor through force, to knowingly benefit from a venture engaged in forced labor, and to knowingly recruit or obtain forced labor. 18 U.S.C. §§ 1589, 1590. An individual who is a victim of a violation of §1589 or §1590 may bring a civil action against a beneficiary of the violation who (1) knowingly benefited or received anything of value, (2) through participation in a venture, (3) "which [the beneficiary] knew or should have known has engaged in an act in violation of [§1589 or §1590]." 18 U.S.C. § 1595(a);

52

see also *H.G. v. Inter-Cont'l Hotels Corp.*, No. 19-CV-13622, 2020 WL 5653304, at *4 (E.D. Mich. Sept. 23, 2020)."The first element merely requires that [the d]efendant knowingly receive a financial benefit." *H.H. v. G6 Hosp., LLC*, No. 2:19-CV-755, 2019 WL 6682152, at *2 (S.D. Ohio Dec. 6, 2019)."[T]he relevant state-of-mind inquiry for purposes of the third element focuses on whether the defendant knew or should have known of [the violations] by the venture in which he allegedly participated." *H.G.,* 2020 WL 5653304, at *5. A determination that the defendant acted negligently or in reckless disregard may support a finding that the beneficiary "should have known" of the violations. *Cf. M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 968–69 (S.D. Ohio 2019). Nevertheless, "knowledge or willful blindness of a general [] trafficking problem in [an industry] does not satisfy the *mens rea* requirements of the TVPRA." *S.J. v. Choice Hotels Int'l, Inc.*, No. 19-CV-6071 (BMC), 2020 WL 4059569, at *5 (E.D.N.Y. July 20, 2020).

The Complaint alleges that Defendants received a financial benefit from the 2017 Plaintiffs' work, which Defendants closely controlled and supervised. (*See* ECF No. 1, PageID.13–14, ¶¶ 85–96.) It also plausibly asserts that Defendants engaged in a venture with VCH as evidenced by

the contract between Four Star and VCH, which was signed by Smith. (*See* ECF No. 18-1; *see also* ECF No. 1, PageID.6, ¶¶ 31–32; PageID.9–10, ¶¶ 57–62.) As such, Plaintiffs must sufficiently allege that Defendants knew or should have known of VCH's violations of the TVPRA.

### 1. Forced Labor Violations

Plaintiffs first seek to recover for violations of the TVPRA's forced labor provisions. The relevant portion of the statute states:

> (a) Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means--
>
> > . . .
> >
> > (2) by means of serious harm or threats of serious harm to that person or another person;
> >
> > (3) by means of the abuse or threatened abuse of law or legal process; or
> >
> > (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint,
>
> shall be punished as provided under subsection (d).
>
> (b) Whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in

reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means, shall be punished as provided in subsection (d).

18 U.S.C. § 1589.

VCH's frequent efforts to move the 2017 Plaintiffs from state to state, repeated failure to pay them on time or at all, threats to blacklist them from the H-2A program, and threats to send them back to Mexico, suggest multiple violations of the TVPRA by VCH. (*See* ECF No. 1, PageID.11–12, ¶¶72–79; PageID.14 ¶ 100; PageID.16, ¶ 112.) However, as set forth below, the Complaint fails to provide factual support for Plaintiffs' conclusory assertions that Defendants "knew or should have known" of these abuses by VCH.[21] (*See id.* at PageID.15, ¶¶ 104–07; PageID.26–27, ¶¶182–84.)

### a. Serious Harm or Threats of Serious Harm

Plaintiffs first allege that

Defendants knew or should have known that VCH provided or obtained labor from the 2017 Plaintiffs by *threatening the 2017 Plaintiffs with blacklisting* that would bar future economic opportunities, by *refusing to reimburse travel and*

---

[21] As set forth above, "although conditions of a person's mind may be alleged generally, the plaintiff still must plead facts about the defendant's mental state, which, accepted as true, make the state-of-mind allegation plausible on its face." *Katoula*, 557 F. App'x at 498 (quoting *Republic Bank & Trust.*, 683 F.3dat 247).

*visa costs* that the 2017 Plaintiffs had paid with high-interest loans, and by *refusing to pay the 2017 Plaintiffs* even subsistence-level wages in a manner that caused serious harm under 18 U.S.C. § 1589(a)(2).

(ECF No. 1, PageID.26, ¶ 183 (emphasis added).) As used in § 1589, "serious harm" is defined as "any harm," including financial harm, "that is sufficiently serious . . . to compel a reasonable person . . . to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2). In other words, the harm or threat of harm must be one that compels the victim to remain when they otherwise would have left. *See Muchira v. Al-Rawaf*, 850 F.3d 605, 618 (4th Cir. 2017) (quoting *United States v. Dann*, 652 F.3d 1160, 1170 (9th Cir. 2011)).

While the Complaint details several threats of blacklisting made by VCH, Plaintiffs do not allege that they notified Defendants of these threats or that any of Defendants' employees overheard or were otherwise informed of them. Similarly, there are no allegations in the Complaint that Defendants were ever made aware of VCH's failure to reimburse the 2017 Plaintiffs' travel and visa costs prior to their arrival in Michigan.

56

Instead, Plaintiffs allege that "Santiago-Hernandez complained to two of his Four Star supervisors about his unpaid wages" one week prior to his arrest by immigration authorities.[22] (*Id.* at PageID.16, ¶ 113.) While this may put Defendants on notice of VCH's labor law violations, it does not support an inference that Defendants knew or should have known that the 2017 Plaintiffs were being coerced into remaining in VCH's employ. The Complaint alleges that VCH threatened to continue withholding all of the 2017 Plaintiffs unpaid wages if they did not work for Defendants in Michigan, (*see* ECF No. 1, PageID.11, ¶ 75), but again, Plaintiffs fail to allege how Defendants knew or should have known of this coercion.

In their response, Plaintiffs assert that "Defendants knew or recklessly disregarded that the hourly rate paid to VCH per the terms of their contract was insufficient to cover VCH's myriad costs under the H-2A program . . . short of not paying workers." (ECF No. 27, PageID.314.)

---

[22] Citing to the contract between Four Star and VCH, Plaintiffs assert in their response that "VCH was required to provide Defendants with weekly time and payroll records, which put Defendant[s] on actual notice of VCH's failure to pay Plaintiffs." (ECF No. 27, PageID.314.) However, the Complaint does not actually allege that VCH failed to provide these required records or, assuming the records were provided, that those records demonstrated that the Plaintiffs were not being paid.

In support of this argument, they point to a U.S. Department of Agriculture webpage that details the estimated costs of employing workers under the H-2A program. (*Id.* at PageID.314, 317; *see also* ECF No. 27-4.) However, these allegations are not included in the Complaint and therefore are not properly before the Court. Even if they were, it is unclear how this low reimbursement rate, standing alone, put Defendants on notice that VCH would engage in coercive conduct towards its workers that would constitute serious harm or threats of serious harm under the TVPRA.

As such, Plaintiffs fail to allege that Defendants knew or should have known that their labor was obtained through serious harm or threats of serious harm.

### b. Abuse or Threatened Abuse of Legal Process

Next, Plaintiffs contend that

Defendants knew or should have known that VCH provided or obtained labor from the 2017 Plaintiffs by *threatening the 2017 Plaintiffs with blacklisting* that would bar future immigration opportunities, and by *deceiving the 2017 Plaintiffs about the terms of their immigration status* in a manner that constituted an abuse of the legal process under 18 U.S.C. § 1589(a)(3).

(ECF No. 1, PageID.26, ¶ 183 (emphasis added).) As used in § 1589, "abuse or threatened abuse of law or legal process" is defined as "the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action." 18 U.S.C. § 1589(c)(1). Consistent with this definition, threats to withdraw sponsorship of a visa, warning of immigration consequences, and threats to initiate criminal proceedings have all been held sufficient to support a claim of forced labor. *See Adia v. Grandeur Mgmt., Inc.*, 933 F.3d 89, 93 (2d Cir. 2019); *United States v. Calimlim*, 538 F.3d 706, 713 (7th Cir. 2008); *Barrientos v. CoreCivic, Inc.*, 332 F. Supp. 3d 1305, 1311–12 (M.D. Ga. 2018), *aff'd*, 951 F.3d 1269 (11th Cir. 2020). However, as set forth above, Plaintiffs do not plead any facts that demonstrate how Defendants "knew or should have known" that VCH had threatened the 2017 Plaintiffs with blacklisting from the H-2A program. Similarly, the Complaint does not support an inference that Defendants were aware that VCH lied to the 2017 Plaintiffs about their immigration status, threatened to send them back to Mexico, or coordinated with immigration

59

authorities to have them arrested and placed in removal proceedings. As such, Plaintiffs fail to allege that Defendants knew or should have known that their labor was obtained through abuse or threats of abuse of legal process.

### c. Scheme, Plan, or Pattern

Finally, Plaintiffs assert that

> Defendants knew or should have known that VCH provided or obtained labor from the 2017 Plaintiffs *by a scheme, plan, or pattern designed to isolate and exacerbate the 2017 Plaintiffs' existing vulnerabilities*, which . . . was intended to cause and did cause the 2017 Plaintiffs to believe that they would suffer serious harm if they were to leave the employ of Defendants, in violation of 18 U.S.C. § 1589(a)(4).

(ECF No. 1, PageID.26–27, ¶ 184 (emphasis added).) Though Plaintiffs allege that VCH was fined by the U.S. Department of Transportation and disciplined by Florida's Department of Business and Professional Regulation, (*id.* at PageID.9, ¶¶ 53–54), there is no suggestion that these incidents involved criminal trafficking violations or related coercive practices.[23] As with the claims above, the Complaint contains no other

---

[23] In their response, Plaintiffs assert that VCH "was subject to multiple government investigations involving allegations that VCH confiscated workers' passports and stole their wages." (ECF No. 27. PageID.313–314.) However, these

allegations that allow the Court to infer that Defendants knew or should have known of a scheme, plan, or pattern by VCH to coerce the 2017 Plaintiffs' labor.

Accordingly, the 2017 Plaintiffs' claims under § 1589 are dismissed.

## 2. Trafficking for Forced Labor

Plaintiffs next seek to recover for violations of the TVPRA's trafficking provision. Under 18 U.S.C. § 1590(a), "[w]hoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter shall be fined under this title or imprisoned not more than 20 years, or both." 18 U.S.C. § 1590(a). However, because a violation of this section relies on a corresponding violation of the TVPRA, *see Adia*, 933 F.3d at 94, Plaintiffs similarly cannot establish that Defendants knew or should have known of trafficking by VCH.

Accordingly, the 2017 Plaintiffs' claims under § 1590 are also dismissed.

## F. Failure to Pay Minimum Wages Under Michigan Law

---

allegations are not included in the Complaint and therefore cannot be considered for the purposes of evaluating Defendants' motion to dismiss.

Next, Plaintiffs (including Ponciano-Serna) allege that Defendants are also liable for violations of Michigan's minimum wage laws.

Enacted in 2014 and replacing Michigan's Minimum Wage Law of 1964,[24] WOWA prohibits employers from paying employees a rate less than the rate proscribed in the Act and provides a private right of action for employees who were paid less than the prevailing wage.[25] MCL §§ 408.413, 408.419. Consistent with the FLSA and the AWPA, WOWA defines "employ" broadly as "engage, suffer, or permit to work." MCL § 408.412(b). "Employer" is also similarly defined as "a person, firm, or corporation . . . and a person acting in the interest of the employer, who employs 2 or more employees at any 1 time within a calendar year." MCL § 408.412(d).

While WOWA does not define "joint employment" or "joint employer," Plaintiffs argue that "Michigan Courts have long applied an economic reality test in assessing employer status for purposes of

_____

[24] *See* 2014 Mich. Pub. Acts 138, effective, May 27, 2014. WOWA was subsequently replaced by the Improved Workforce Opportunity Wage Act (IWOWA), 2018 Mich. Pub. Acts 337, effective, Mar. 29, 2019.

[25] The minimum hourly wage rate beginning January 1, 2017 was $8.50 an hour and increased to $9.25 an hour beginning January 1, 2018. MCL § 408.414(c)–(d).

remedial social legislation."[26] (ECF No. 27, PageID.300.) "Where the Michigan Supreme Court has not addressed the issue presented, [the Court] must predict how the [Michigan Supreme Court] would rule by looking to all the available data; however, decisions by the Michigan Court of Appeals are binding authority where the Michigan Supreme Court has never addressed the issue decided therein." *Berrington v. Wal-Mart Stores, Inc.*, 696 F.3d 604, 607–08 (6th Cir. 2012) (citations and internal quotation marks omitted). Plaintiffs cite two cases, *Tata v. Benjamin Muskovitz Plumbing & Heating*, 354 Mich. 695, 698–99 (1959), and *Goodchild v. Erickson*, 375 Mich. 289, 293–94 (1965), in which the Michigan Supreme Court applied the economic reality test to assess employment relationships under Michigan's workers' compensation law. More recently, the court explained that "[t]he economic-reality test was

---

[26] Defendants fail to substantively engage with Plaintiffs' claims under WOWA. Without citing to any authority other than the statute, they assert in their opening brief that "Defendants are not plausibly alleged to be Plaintiffs' 'employer' under [WOWA]." (ECF No. 18, PageID.167.) In their reply, Defendants argue that "[t]he cases Plaintiffs cite for their WOWA claim (Count VI) do not match the propositions for which Plaintiffs offer them." (ECF No. 30, PageID.370 n.14.) However, Defendants do not offer any other alternative analysis of these cases; nor do they cite to any other authority on which the Court might rely in analyzing this claim.

embraced . . . as a more realistic attempt to define the employer-employee relationship through a 'balancing of all the relevant factors in each case,' than the rigid control test." *Kidder v. Miller-Davis Co.*, 455 Mich. 25, 35 (1997). Applying the economic reality test to a claim under Michigan's Whistleblowers' Protection Act, the Michigan Court of Appeals explained that "[t]he 'control test' has been limited to those situations where respondeat superior has been alleged and the vicarious liability of a master is involved." *Chilingirian v. Fraser*, 194 Mich. App. 65, 69 (1992) (citations omitted); *see also Mantei v. Mich. Pub. Sch. Emples. Ret. Sys.*, 256 Mich. App. 64, 78–79 (2003) (applying the economic reality test to a claim under Michigan's Public School Employees Retirement Act of 1979).

Plaintiffs do not point to—and the Court cannot locate—any cases in which Michigan courts have applied the economic reality test to Michigan's current or former minimum wage laws. However, based upon related caselaw set forth above, the Court will apply this test to Plaintiffs' WOWA claim.[27] Under Michigan law, the economic reality test considers

---

[27] Plaintiffs also assert that "[o]ther courts in this District have also found analysis of an employment relationship under the FLSA to be determinative of

"(1) [the] control of a worker's duties, (2) the payment of wages, (3) the right to hire and fire and the right to discipline, and (4) the performance of the duties as an integral part of the employer's business towards the accomplishment of a common goal," though no one factor is controlling. *Clark v. United Techs. Auto., Inc.*, 459 Mich. 681, 688 (1999) (alteration in original) (quoting *Askew v. Macomber*, 398 Mich. 212, 217–18 (1976)). As set forth above, the allegations in the Complaint establish that Four Star exerted extensive control over Plaintiffs' work, retained the right to hire, fire, and discipline Plaintiffs, and relied on Plaintiffs' work in order to sustain their business. Thus, the Court can reasonably conclude that Four Star could be considered Plaintiffs' joint employer under Michigan's economic reality test. As with the FLSA and AWPA, Smith may also reasonably be considered Plaintiffs' joint employer as "a person acting in the interest of the employer." MCL § 408.412(d).

Accordingly, Plaintiffs may proceed on their WOWA claims.

## G. Breach of Contract Under Michigan Law

---

employment under WOWA." (ECF No. 27, PageID.300 (citing *Sims v. Parke Davis & Co.*, 334 F. Supp. 774, 789 (E.D. Mich. 1971).)

Plaintiffs' next claim is for breach of contract by all Plaintiffs against Four Star. For the reasons below, the Court cannot find an express claim for breach of contract under Michigan law. However, the Court ORDERS supplementary briefing regarding whether the Job Order, or any other understanding between the parties, constitutes an implied contract between Plaintiffs and Four Star on the face of the Complaint.

Under Michigan law, "[a] party asserting a breach of contract must establish . . . that (1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming breach." *Miller-Davis Co. v. Ahrens Const., Inc.*, 495 Mich. 161, 178 (2014). "The elements of a valid contract in Michigan are: 1) parties competent to contract, 2) a proper subject matter, 3) a legal consideration, 4) mutuality of agreement, and 5) mutuality of obligation." *In re Brown*, 342 F.3d 620, 628 (6th Cir. 2003) (citing *Thomas v. Leja*, 187 Mich. App. 418, 422 (1990)).

Contracts may be either express or implied. In this case, Plaintiffs presumably allege an express contract between the parties, because they state that they "entered into an employment contract with Four Star to

66

work for Four Star in Michigan during the 2018 season under the H-2A program," and that the "Four Star Job Order contains the terms and conditions of the employment contract." (ECF No. 1, PageID.28, ¶¶ 198–99.) However, Four Star is not a party to the Order, which was instead obtained by VCH. (*See* ECF No. 37-1; *see also* ECF No. 1, PageID.10, ¶ 61.)[28] Thus, under Michigan law, the relevant questions are 1) whether non-signatories to an employment contract may nevertheless be held liable for breach of contract as joint employers; and 2) whether Four Star is a joint employer within the meaning of Michigan contract law.

Plaintiffs argue that, "[u]nder the H-2A regulations and existing case law, clearance orders such as the []Four Star Job Order constitute employment contracts that are enforceable under state law." (ECF No. 27, PageID.301.) Relying on an Eleventh Circuit case, Plaintiffs assert

---

[28] Further complicating Plaintiffs' claim, only Ponciano-Serna was actually working under the Four Star Job Order, while the 2017 Plaintiffs were performing "corresponding employment." (ECF No. 1, PageID.28, ¶¶ 200–01.) The regulations define "corresponding employment" as "[t]he employment of workers who are not H–2A workers by an employer who has an approved H–2A Application for Temporary Employment Certification in any work included in the job order, or in any agricultural work performed by the H–2A workers. To qualify as corresponding employment the work must be performed during the validity period of the job order, including any approved extension thereof." 20 C.F.R. § 655.103(b).

that Four Star may be held liable for a breach of this H-2A work contract if Four Star qualifies as Plaintiffs' employer or joint employer under the Immigration and Nationality Act (INA) and current H-2A regulations. (ECF No. 27, PageID.302 (citing *Garcia-Celestino v. Ruiz Harvesting, Inc.* (*Garcia-Celestino I*), 843 F.3d 1276, 1284–86 (11th Cir. 2016) (remanding the case "to the district court to decide in the first instance whether, under the common law principles of agency, [a company] qualifies as a joint employer for purposes of the plaintiffs' breach of contract claims")).)

However, even if Four Star were to qualify as a joint employer under federal or Michigan common law—as opposed to statutory labor law, as previously addressed—it is not clear under Michigan law that a joint employer may be held responsible for breach of a contract that it did not sign. Specifically, it is not clear from the cases reviewed by the Court that the rationale undergirding FLSA joint employer liability—the need to protect workers' rights by upholding objective labor standards—ports into Michigan contract law. The Court could find no such cases, and Plaintiffs did not proffer them. Accordingly, the Court cannot find an express contract on the face of the Complaint.

68

However, neither party adequately addresses whether the Job Order, or any other understanding between the parties, constitutes an implied contract. Under Michigan law, "[a]n implied contract, like other contracts, requires mutual assent and consideration." *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 456 (6th Cir. 2001) (alteration in original) (quoting *Spruytte v. Dep't of Corr.*, 82 Mich. App. 145, 147 (1978)). "There are two kinds of implied contracts: one implied in fact and the other implied in law. The first does not exist, unless the minds of the parties meet, by reason of words or conduct. The second is quasi or constructive, and does not require a meeting of minds, but is imposed by fiction of law, to enable justice to be accomplished, even in case no contract was intended." *Contship Containerlines, Inc. v. Howard Indus., Inc.*, 309 F.3d 910, 914 (6th Cir. 2002) (quoting *Murray Hill Publ'ns., Inc. v. ABC Commc'ns, Inc.*, 264 F.3d 622, 637 (6th Cir. 2001)).

Accordingly, the Court ORDERS that that Plaintiffs provide supplementary briefing to the Court on this question by two weeks from the date of this Order. Defendants may respond within two weeks of Plaintiffs' supplementary brief.

## H. Unjust Enrichment Under Michigan Law

Plaintiffs' final claim is for unjust enrichment by all Plaintiffs against both Defendants. For the reasons below, the Court finds that Plaintiffs fail to state a claim.

Under Michigan law, unjust enrichment requires the plaintiff to establish: "(1) the receipt of a benefit by the other party from the complaining party and (2) an inequity resulting to the complaining party because of the retention of the benefit by the other party." *Karaus v. Bank of New York Mellon*, 300 Mich. App. 9, 22–23 (2012). "Whether a specific party has been unjustly enriched is generally a question of fact," but "whether a claim for unjust enrichment can be maintained is a question of law." *Morris Pumps v. Centerline Piping, Inc.*, 273 Mich. App. 187, 193 (2006). "[T]he key to determining whether enrichment is unjust is determining whether a party unjustly received and retained an independent benefit." *Landstar Express Am., Inc. v. Nexteer Auto. Corp.*, 319 Mich. App. 192, 205 (2017) (alteration in original) (quoting *Kraus*, 300 Mich. App. at 23). "Moreover, where a third person benefits from a contract entered into between two other persons, *in the absence of some misleading act by the third person*, the mere failure of performance by one of the contracting parties does not give rise to a right of restitution

70

against the third person." *Id.* (emphasis added) (quoting *Morris Pumps*, 273 Mich. App. at 196). If the plaintiff meets their burden, "the law will imply a contract in order to prevent unjust enrichment."[29] *Belle Isle Grill Corp. v. City of Detroit*, 256 Mich. App. 463, 478 (2003) (citing *Martin v. East Lansing School Dist.*, 193 Mich. App. 166, 177 (1992)).

The Complaint alleges that Defendants were "unjustly enriched by their practice of failing to pay Plaintiffs for all hours worked and for failing to reimburse Plaintiffs some or all of [Plaintiffs'] inbound and outbound transportation costs." (ECF No. 1, PageID.30, ¶ 205.) They also assert that "Defendants accepted the benefits of Plaintiffs' labor under circumstances such that it would be inequitable[,] and Defendants would

---

[29] While "a contract will be implied only if there is no express contract covering the same subject matter," *Morris Pumps*, 273 Mich. App. at 193–95 (quoting *Belle Isle Grill*, 256 Mich. App. 478), the existence of an express agreement is not necessarily dispositive of an unjust enrichment claim at the motion to dismiss stage, *see XXX Int'l Amusements, Inc. v. Se. Visuals, LLC*, No. 17-11778, 2017 WL 3877177, at *2 (E.D. Mich. Sept. 5, 2017). "Federal Rule of Civil Procedure 8(a)(3) permits pleadings in the alternative 'when, for instance, there is a dispute between the parties as to whether an express agreement exists.'" *Id.* (quoting *Bowlers' Alley, Inc. v. Cincinnati Ins. Co.*, 32 F.Supp.3d 824, 833–34 (E.D. Mich. 2014)). If the defendant may continue to dispute the existence of the contract in subsequent proceedings, it is premature to dismiss a plaintiff's unjust enrichment claim based on the existence of that agreement. *Id.* (citing *Terry Barr Sales Agency, Inc. v. All–Lock Co., Inc.*, 96 F.3d 174, 182 (6th Cir. 1996)).

be unjustly enriched if they are permitted to retain the benefit of such labor without payment to Plaintiffs." (*Id.* at ¶ 207.)

Without explanation, Defendants assert that "[t]hey did not receive a benefit from Plaintiffs." (ECF No. 18, PageID.169 (emphasis omitted).) They also argue that they paid Vasquez "in full . . . for every hour Plaintiffs worked" and that "[i]t would in fact be unjust to require Defendants to pay twice and take away from them the benefit of their contract with Vasquez." (*Id.* at PageID.169–170.) Plaintiffs respond that "Defendants directly benefited from their labor" because they worked "under Defendants' direction, at Defendants' facilities, furthering Defendants' nursery business." (ECF No. 27, PageID.316.) They then assert that "[r]egardless of whether Defendants paid VCH as required under the 2017 Contract, Plaintiffs allege that Defendants unfairly profited from this arrangement because their payments to VCH were insufficient to cover the full cost of employing Plaintiffs."[30] (*Id.*)

As an initial matter, these arguments fail to distinguish between the two Defendants and—more importantly—fail to address what unjust

---

[30] As set forth above, this argument relies on exhibits attached to Plaintiffs' response that are not included in the Complaint.

benefit Smith received separate and apart from Four Star. Without allegations that Four Star's corporate form should be ignored, it is unclear how Smith can be individually liable based solely on his role as Four Star's owner and corporate officer. *Cf. Foodland Distributors v. Al-Naimi,* 220 Mich. App. 453, 456 (1996) ("As a general proposition, the law treats a corporation as an entirely separate entity from its stockholders, even where one person owns all the corporation's stock.")

With respect to Four Star, the Complaint supports Plaintiffs' contention that they conferred a benefit on Four Star through their labor. But it is unclear how the "foreseeably insufficient" reimbursement rate between VCH and Four Star (*see* ECF No. 27, PageID.317) constitutes an unjust benefit for which Plaintiffs can recover. Nor is it clear how this reimbursement rate establishes a "practice of failing to pay Plaintiffs" by Four Star. (*See* ECF No. 1, PageID.30, ¶ 205.) Most importantly, without allegations that demonstrate how Four Star's actions were actually misleading, "the mere failure of performance by [VCH] does not give rise to a right of restitution against [Four Star]." *Landstar Express Am.*, 319 Mich. App.at 205.

Accordingly, Plaintiffs unjust enrichment claim is dismissed.

73

## IV.   Conclusion

For the reasons set forth above, Defendants' motion is GRANTED IN PART and DENIED IN PART. Plaintiffs' claims for violations of the TVPRA (Count V) and unjust enrichment (Count VIII) are DISMISSED.

The Court ORDERS Plaintiffs to provide supplementary briefing regarding the implied contract question within two weeks of the date of this Order. Defendants my respond within two weeks of the date that Plaintiffs file their supplemental brief.

IT IS SO ORDERED.

Dated: January 12, 2021        s/Judith E. Levy
Ann Arbor, Michigan            JUDITH E. LEVY
                               United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 12, 2021.

                    s/William Barkholz
                    WILLIAM BARKHOLZ
                    Case Manager